COMMONWEALTH CONTAINER CORP., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2427–65. Filed June 28, 1967.

*Norman E. Schlesinger*, for the petitioner.
*Albert Squire*, for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in petitioner's income taxes for the calendar years 1961 and 1962 in the amounts of

---

$66,597.10 and $69,310.14, respectively. The only issue is what part of the net operating loss carryover of Tri-City Container Corp. (hereinafter referred to as Tri-City), which merged into petitioner on or about June 21, 1961,[1] may be included in petitioner's net operating loss deduction for the years 1961 and 1962. Petitioner claims it is entitled to deduct the entire net operating loss carryover of Tri-City, as provided in section 381(a)(2) and (c)(1), I.R.C. 1954.[2] In his notice of deficiency respondent determined that petitioner was not entitled to deduct any part of the net operating loss carryover of Tri-City because of the special limitations provided in section 382(b)(1), but on brief concedes that petitioner is entitled to deduct 65 percent of the carryover as computed under section 382(b)(2).

FINDINGS OF FACT

The stipulated facts are so found.

Petitioner is a corporation organized under the laws of New Jersey on October 4, 1951. Petitioner filed income tax returns for the calendar years 1961 and 1962 with the district director of internal revenue at Philadelphia, Pa. On May 7, 1965, the date the petition herein was filed with the Court, petitioner's principal place of business was in Trexlertown, Pa.

Petitioner was organized by Paul and Irwin Densen, who are brothers, and Abbot Greene, their brother-in-law, who purchased shares of petitioner's common stock as follows:

| Stockholder | Number of shares | Price |
|---|---|---|
| Paul Densen | 142½ | $14,250 |
| Abbot Greene | 142½ | 14,250 |
| Irwin Densen | 15 | 1,500 |
| Total | 300 | 30,000 |

Since August 1960, petitioner has had an authorized capital of 2,500 shares of $100 par value common stock, and 1,250 shares of 5-percent cumulative preferred stock having a par value of $100 per share, callable at $105 per share.

Petitioner was engaged in the business of manufacturing corrugated paperboard and corrugated containers at its plant in Trexlertown, Pa., which it sold in the area comprised of western New Jersey and eastern Pennsylvania.

---

[1] The agreement of consolidation and merger was filed with the secretary of state of New York on June 21, 1961. A final income tax return was filed for Tri-City Container Corp. covering the period Jan. 1, 1961, to June 17, 1961, the last day of the business week prior to the filing of the merger agreement on June 21, 1967.

[2] All section references are to the Internal Revenue Code of 1954 unless otherwise indicated.

Tri-City was a corporation organized under the laws of New York on March 4, 1955, with an authorized capital of 200 shares of no-par-value stock, of which 180 shares were issued as follows:

| Stockholder | Number of shares |
|---|---|
| Paul Densen | 85½ |
| Abbot Greene | 85½ |
| Irwin Densen | 9 |
| Total | 180 |

Paul Densen and Abbot Greene each subsequently gave 10 shares of their Tri-City stock to trusts for their children. At all times here relevant Tri-City was engaged in the business of manufacturing corrugated paperboard and corrugated containers at its plant in Northampton, Mass., which it sold in the southern New England area.

Eastern Corrugated Container Corp. (hereinafter referred to as Eastern) is a New York corporation organized in 1922 with its principal office in Clifton, N.J., which is engaged in the manufacture of corrugated paperboard and corrugated containers. In 1961 the capital stock of Eastern consisted of 9,570 [3] shares of common stock, of which 3,007½ shares were owned by Bertha Densen (mother of Paul and Irwin Densen and Shirley Greene), 2,007½ shares were held by each of Paul and Irwin Densen and Shirley Greene (and trusts for their children), and 330 shares were held by an unrelated employee. Eastern sold corrugated paperboard and other materials to petitioner and Tri-City which they used in manufacturing corrugated containers. On May 27, 1960, when petitioner's obligations to Eastern for materials and supplies purchased on open account had a balance of at least $125,000, petitioner issued 1,250 shares of its preferred stock to Eastern with respect to that liability. On October 1, 1960, petitioner redeemed 500 shares of this preferred stock at $105 per share.

Elmer Hertzmark (hereinafter referred to as Hertzmark) was employed by petitioner in 1951 as plant manager, and was vice president and a director of petitioner and general manager of its Trexlertown plant at all times relevant. On February 28, 1955, Hertzmark and petitioner entered into a written employment agreement for a term of 6 months from January 1 to July 1, 1955, and from year to year thereafter until either petitioner or Hertzmark should give 30 days' notice of cancellation prior to July 1 of any year. The only provisions of the employment agreement of particular relevancy to the issue before us were those with reference to stock of the petitioner.

Paragraph Thirteenth of the agreement provided that in consideration of the payment by Hertzmark of $12,084, petitioner would cause

---

[3] As stipulated.

to have issued to Hertzmark 75 shares of its common stock, which would constitute 25 percent of all the issued and outstanding common stock. Paragraphs Fourteenth and Fifteenth restricted Hertzmark's right to sell, assign, hypothecate, and in any manner encumber the stock without the written permission of petitioner, and the stock certificate was to be endorsed to indicate that it was not transferable except in accordance with the terms of the agreement. Paragraph Fourteenth also provided, in general, that in the event Hertzmark ceased to be an employee of the company either voluntarily or at the choice of petitioner, or because of illness or death, or in the event Hertzmark chose to sell the stock, the stock was first to be offered to petitioner or its stockholders for sale at a price to be determined by petitioner's accountant, who should determine "the value of the said shares as of the date of the last regular quarterly audit," plus profits to date. In some circumstances petitioner was required to buy the stock; in others Hertzmark could sell the stock to outsiders if petitioner or its other stockholders did not choose to buy it.

To carry out the terms of the employment agreement, Hertzmark paid $12,084 to Paul Densen and Abbot Greene and they each transferred 37½ shares of their stock to Hertzmark. A certificate for 75 shares of stock was issued to Hertzmark dated February 28, 1955. The stock transferred to Hertzmark had voting rights and rights to receive dividends equal in all respects to the shares retained by Densen and Greene. No cash dividends have been paid on petitioner's stock but Hertzmark regularly attended stockholders and directors meetings and voted his stock. This employment agreement continued in effect until January 1, 1962, when it was superseded by a written agreement dated January 5, 1962.

On January 4, 1958, Paul Densen and Abbot Greene transferred portions of their common stock of petitioner to trusts for their children. On September 20, 1960, a common stock dividend of three shares was issued to the holder of each outstanding share of petitioner. Thereafter and until June 21, 1961, the date of the merger of Tri-City into petitioner, the common stock of petitioner was held as follows:

| Stockholder | Number of shares | Percentage of total |
|---|---|---|
| Paul Densen | 356 | 29. 66 |
| Abbot Greene | 356 | 29. 66 |
| Irwin Densen | 60 | 5. 00 |
| Elmer Hertzmark | 300 | 25. 00 |
| Various parties as trustees of four trusts for the Densen and Greene children, holding 32 shares for each trust—total | 128 | 10. 68 |
| Total | 1, 200 | 100. 00 |

For some time prior to 1961 petitioner had operated at a profit while Tri-City had operated at a loss. Sometime during 1960 the stockholders of petitioner and of Tri-City decided to merge the two companies. Tax considerations as well as business considerations entered into this decision.

At special meetings of the board of directors of both petitioner and Tri-City held on November 4, 1960, the officers of both companies were authorized to enter into a plan of reorganization under which the assets and business of Tri-City would be transferred to petitioner in exchange for 300 shares of petitioner's common stock, which would be distributed by Tri-City to its stockholders in liquidation. On January 25, 1961, counsel for petitioner requested a ruling from respondent that the plan of reorganization above mentioned would qualify under section 368(a)(1)(D) of the Code and that no gain or loss would be recognized on the exchange and distribution either to the corporations or to Tri-City's stockholders. On February 16, 1961, respondent's representative advised petitioner's counsel that additional information would be required before a ruling could be issued. Petitioner's counsel thereupon withdrew the request for a ruling and that plan of reorganization was not implemented.

At special meetings of the boards of directors and stockholders of petitioner and Tri-City held on March 22, 1961, the original plan of reorganization authorized on November 4, 1960, was voided and a new plan was adopted which provided for the merger of petitioner and Tri-City, with petitioner to continue as the consolidated corporation. Under this plan each share of the outstanding common stock of Tri-City was to be exchanged for and converted to one share of the common stock of the consolidated corporation (petitioner). Pursuant to that plan and the statutes of New Jersey and New York an agreement of merger and consolidation and a certificate of consolidation were executed by petitioner and Tri-City on March 30, 1961. The agreement of merger and consolidation was filed with the secretary of state of New Jersey on June 21, 1961, and a certificate of consolidation was filed with the secretary of state of New York on July 18, 1961. Under the terms of the agreement the separate existence of Tri-City ceased upon consummation of the merger and consolidation.

Immediately prior to the merger, the 180 shares of the outstanding stock of Tri-City were held as follows:

| Stockholder | Number of shares | Percentage of total |
|---|---|---|
| Paul Densen | 75½ | 41.94 |
| Abbot Greene | 75½ | 41.94 |
| Irwin Densen | 9 | 5.00 |
| Various parties as trustees of four trusts[1] holding 5 shares for each trust—total | 20 | 11.02 |
| Total | 180 | 100.00 |

[1] These are the same trusts that held stock of petitioner.

The outstanding common stock of petitioner was held, immediately prior to the merger on June 21, 1961, as heretofore set out.

Immediately after the merger and until September 25, 1964, the certificates representing all of petitioner's outstanding common stock were issued as follows:

| Stockholder | Number of shares | Percentage of total |
|---|---|---|
| Paul Densen | 431½ | 31.20 |
| Abbot Greene | 431½ | 31.20 |
| Elmer Hertzmark | 300 | 21.74 |
| Irwin Densen | 69 | 5.00 |
| Various parties as trustees of four trusts, holding 37 shares for each trust—total | 148 | 10.72 |
| Total | 1,380 | [1]100.00 |

[1] It has been stipulated that this does not add up to total due to rounding.

Immediately prior to the merger, Tri-City had a net operating loss carryover of $271,936.99, computed as set out in the stipulation of facts.

On January 5, 1962, petitioner and Hertzmark entered into a new employment agreement providing for Hertzmark's employment by petitioner for 1 year from January 1 to December 31, 1962, and renewable from year to year unless either party gives notice of termination on or before December 1 of any employment year. This agreement, after first making reference to prior employment agreements, stated that it was the intention of the parties to enter into a new agreement constituting their complete understanding with respect to Hertzmark's employment and stock interest in petitioner and to nullify all prior agreements with respect thereto. It thereafter set forth the terms of the employment in provisions similar to those contained in the previous employment agreement, with certain modifications.

Paragraph 12 of the new agreement recognized that Hertzmark had paid $12,084 to petitioner and that petitioner had issued to Hertzmark 300 shares of its common stock, representing 25 percent of the issued and outstanding shares of such common stock. This agreement also required Hertzmark, or his representatives, to offer the stock to petitioner or its other stockholders for purchase in the event of the death, termination of employment, or incapacity of Hertzmark, or his desire to sell the stock, and restricted his right to assign, hypothecate, etc., the stock. The price at which the stock was to be offered to petitioner was to be determined by the certified public accountant then serving petitioner by reference to the nearest regular quarterly audit of petitioner, but in determining that value any value attributable to the assets and business of the Tri-City division of petitioner was to be excluded from the overall value of petitioner; also the value of the interest represented by Hertzmark's stock was to be equal to 25 percent of the value

of all of petitioner's issued and outstanding stock, after deducting such value as may be attributable to the Tri-City division.

Petitioner's records indicate that after the merger the Tri-City plant was continued as a separate division of petitioner and independent division financial records were kept. These records indicate that the Tri-City division continued to operate at a loss in the years subsequent to the merger, while petitioner (excluding the Tri-City division) operated at a profit.

Sometime in 1964, the Internal Revenue agent who was examining petitioner's income tax return for the year 1961 told petitioner's representative that, in his opinion, section 382(b) might require a reduction of the net operating loss carryover which petitioner acquired from Tri-City as a result of the merger. Thereafter, sometime after September 25, 1964, petitioner issued certificates representing 120 additional shares of its common stock to the persons who had been stockholders of Tri-City before the merger. These certificates were dated October 19, 1961. These 120 shares increased the total of petitioner's outstanding common stock to 1,500 shares, which were then held as follows:

| Stockholder | Number of shares | Percentage of total |
|---|---|---|
| Paul Densen | 481⅚ | 32.12 |
| Abbot Greene | 481⅚ | 32.12 |
| Elmer Hertzmark | 300 | 20.00 |
| Irwin Denzen | 75 | 5.00 |
| Various parties as trustees of four trusts, holding 40⅓ shares for each trust—total | 161⅓ | 10.76 |
| Total | 1,500 | 100.00 |

ULTIMATE FINDINGS

The stockholders of Tri-City (immediately before the merger), as a result of owning stock of Tri-City, owned (immediately after the merger) 13 percent of the fair market value of the outstanding common stock of petitioner.

Petitioner and Tri-City were not owned substantially by the same persons in the same proportions.

OPINION

The principal issue is whether the amount of the net operating loss carryover of Tri-City, acquired by petitioner as the result of a merger with Tri-City, which petitioner may include in its net operating loss deduction is limited by section 382(b) of the Code.

Sections 381 (a) (2) and (c) (1)[4] of the Code provide that in the case of the acquisition of assets of a corporation by another corporation in a section 368 (a) (1) (A), (C), (D), or (F) reorganization to which section 361 applies the acquiring corporation shall succeed to and take into account the net operating loss carryover of the transferor corporation. If no other statutes were involved it would appear that petitioner was entitled to take into account for years subsequent to the merger the entire amount of Tri-City's operating loss carryover.

However, section 382 (b) (1)[5] provides that if, in a reorganization specified in section 381 (a) (2), the transferor corporation or the acquiring corporation has a net operating loss which is a net operating loss carryover to the first taxable year of the acquiring corporation ending after the date of the transfer, and the stockholders (immediately before the reorganization) of the loss corporation, as the result of owning stock of the loss corporation, own (immediately after the reorganization) less than 20 percent of the fair market value of the stock of the acquiring corporation, the total net operating loss carryover of the loss corporation, which the acquiring corporation may

---

[4] SEC. 381. CARRYOVERS IN CERTAIN CORPORATE ACQUISITIONS.

(a) GENERAL RULE.—In the case of the acquisition of assets of a corporation by another corporation—

\* \* \* \* \* \* \*

(2) in a transfer to which section 361 (relating to nonrecognition of gain or loss to corporations) applies, but only if the transfer is in connection with a reorganization described in subparagraphs (A), (C), (D) (but only if the requirements of subparagraphs (A) and (B) of section 354(b)(1) are met), or (F) of section 368(a)(1),

the acquiring corporation shall succeed to and take into account, as of the close of the day of distribution or transfer, the items described in subsection (c) of the distributor or transferor corporation, subject to the conditions and limitations specified in subsections (b) and (c).

\* \* \* \* \* \* \*

(c) ITEMS OF THE DISTRIBUTOR OF TRANSFEROR CORPORATION.—The items referred to in subsection (a) are:

(1) NET OPERATING LOSS CARRYOVERS.—The net operating loss carryovers determined under section 172, subject to the following conditions and limitations:

[5] SEC. 382. SPECIAL LIMITATIONS ON NET OPERATING LOSS CARRYOVERS.

(b) CHANGE OF OWNERSHIP AS THE RESULT OF A REORGANIZATION.—

(1) IN GENERAL.—If, in the case of a reorganization specified in paragraph (2) of section 381(a), the transferor corporation or the acquiring corporation—

(A) has a net operating loss which is a net operating loss carryover to the first taxable year of the acquiring corporation ending after the date of transfer, and

(B) the stockholders (immediately before the reorganization) of such corporation (hereinafter in this subsection referred to as the "loss corporation"), as the result of owning stock of the loss corporation, own (immediately after the reorganization) less than 20 percent of the fair market value of the outstanding stock of the acquiring corporation,

the total net operating loss carryover from prior taxable years of the loss corporation to the first taxable year of the acquiring corporation ending after the date of transfer shall be reduced by the percentage determined under paragraph (2).

(2) REDUCTION OF NET OPERATING LOSS CARRYOVER.—The reduction applicable under paragraph (1) shall be the percentage determined by subtracting from 100 percent—

(A) the percent of the fair market value of the outstanding stock of the acquiring corporation owned (immediately after the reorganization) by the stockholders (immediately before the reorganization) of the loss corporation, as the result of owning stock of the loss corporation, multiplied by

(B) five.

utilize, shall be limited as determined under paragraph (2). Succinctly stated, paragraph (2) reduces the total net operating loss carryover by 5 percent for each percentage point below 20 percent of the fair market value of the stock of the acquiring corporation acquired by the stockholders of the loss corporation as a result of the reorganization. If the limitation of section 382(b) is applicable petitioner would be entitled to include in its net operating loss deduction only 65 percent of Tri-City's net operating loss carryover.[6]

Whether section 382(b) is applicable depends, except as might otherwise be affected by section 382(c), upon whether the fair market value of Hertzmark's stock of petitioner must be included in the 20-percent computation.

Petitioner argues first that inasmuch as the stockholders of Tri-City had a controlling interest in petitioner both before and after the merger, there was the requisite continuity of interest in the operating loss carryover which Congress sought to require in order to make the entire operating loss carryover available to the acquiring corporation. We agree that in enacting section 381(c)(1) Congress sought to liberalize the carryover of operating losses in certain corporate reorganizations but we must also recognize that in section 382(b) Congress established an objective test to determine whether all or only a part of the operating loss carryover would be available to the acquiring corporation in such a reorganization; and that the test is based upon the percentage of interest in the acquiring corporation the stockholders of the loss corporation *receive as a result of the reorganization.* To interpret the statute otherwise would require reading the phrase "as the result of owning stock of the loss corporation" completely out of the statute; and this we are not justified in doing. *Hanover Bank* v. *Commissioner,* 369 U.S. 672; *Frank W. Verito,* 43 T.C. 429.

There was no counterpart of sections 381 and 382 in the 1939 Code and the "trafficking in loss corporations," while extensive, was a rather uncertain venture under the Court-made rules applied in disallowing operating loss carryovers to successor corporations or businesses. In adopting sections 381 and 382 of the 1954 Code, Congress apparently intended to liberalize and make more certain the availability of the net operating loss carryover to successor corporations and businesses, provided there was not a substantial change in ownership of a closely held corporation. In the House version of H.R. 8300, 83d

---

[6] Assuming the fair market value of each share of petitioner's stock is the same. Neither party argues that the percentage of the fair market value of petitioner's outstanding stock represented by Hertzmark's stock was any different than the percentage of the total outstanding shares of petitioner's stock represented by Hertzmark's shares, although petitioner does argue that because of the employment agreement Hertzmark's shares should be ignored for purposes of the computation under sec. 382(b) and the application of sec. 382(b)(3). There is no evidence in the record from which we could determine the fair market value of any of petitioner's stock and we have not been asked to do so. Neither does either party make any reference to the preferred stock of petitioner which was outstanding at the time of the merger.

Cong., 2d Sess. (see H. Rept. No. 1337, p. A135 *et seq.*) the carryover was made available to the acquiring corporation, limited only if there was a change of at least 50 percentage points in the ownership of stock by any 1 or more of the 10 largest stockholders during a 2-year period as a result of a purchase or redemption of stock, in which event there would be a percentage reduction in the amount of the loss carryover available. The Senate bill, however, modified the limitation provision, eliminating the carryover entirely if there was a 50-percent or more change in ownership of the stock and a substantial change in the trade or business conducted, and providing for the reduction in the amount of the carryover available unless the acquiring corporation gave up at least a 20-percent interest to the stockholders of the corporation with a net operating loss carryover. The Senate Finance Committee report (see S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 284, 286), specifically states that the "stockholders of the corporation with the net operating loss carryover must own, as a result of owning stock in the loss corporation immediately before the reorganization, 20 percent or more of the fair market value of the outstanding stock of the acquiring corporation or the reduction in paragraph (2) will apply."

The Senate version of section 382 was accepted by the Conference Committee and became the law. While it seems quite likely that the clause "as a result of owning stock of the loss corporation" was inserted by Congress to prevent avoidance of the limitation by the stockholders of the loss corporation temporarily buying stock of the acquiring corporation immediately before the reorganization, rather than the situation we have here where they already owned the stock of the acquiring corporation, nevertheless there is no ambiguity in the words used in the statute, and if they are applied literally here, the reduction provided in section 382 must be applied. Compare *Barr* v. *United States*, 324 U.S. 83; *Estate of Edna Allen Miller*, 48 T.C. 251 (1967). While the stockholders of Tri-City (the loss corporation) owned 1,080 of the 1,380 shares of petitioner outstanding immediately after the merger, or over 78 percent, they received only 180 shares, or about 13 percent of the shares of petitioner's common stock as a result of the merger.

Section 1.382(b)–1(a)(2), Income Tax Regs., provides as follows:

The ownership of at least 20 percent of the fair market value of the stock of the acquiring corporation after the reorganization must result from the ownership of stock in the loss corporation immediately before the reorganization. Thus, if stockholders of a transferor-loss corporation before the reorganization also own stock of the acquiring corporation at such time, such stock of the acquiring corporation is not considered as owned after the reorganization by such stockholders as a result of owning stock in the loss corporation in determining whether the 20-percent requirement is satisfied. Moreover, the stockholders (immediately before the reorganization) of a transferor-loss corporation shall not be regarded as owning, immediately after the reorganization, any stock

of the acquiring corporation which is not distributed to such stockholders pursuant to the plan of reorganization.

We think this is a reasonable interpretation of the statute.

We cannot ignore the clear language of the statute, and unless there is some other reason why the reduction provided in section 382(b)(1) and (2) should not be applied, we must sustain respondent's position that only 65 percent of the Tri-City net operating loss carryover is available to petitioner.

Petitioner argues, abeit without much conviction, that the issuance of the additional 120 shares of petitioner's stock to the former stockholders of Tri-City sometime after September of 1964, thus bringing the interest they received as a result of the merger up to exactly 20 percent of petitioner's stock, should avoid the application of section 382(b). It may be that because the Densens and Greenes controlled both corporations prior to the merger, the merger agreement could just as well have provided for the issuance of 300 shares of petitioner's stock in exchange for the Tri-City stock, but the fact remains that it did not do so. The merger agreement under which the merger was accomplished provided for the issuance of 1 share of petitioner's stock for each share of Tri-City stock and only 180 shares of petitioner's stock were issued in effecting the merger. Section 382(b)(1)(B) provides specifically that if the stockholders of the loss corporation "own (immediately after the reorganization) less than 20 percent" of the fair market value of the stock of the acquiring corporation, as a result of the reorganization, the reductions provided in paragraph (2) of subsection (b) shall be applied. The stockholders of Tri-City did not own the additional 120 shares of petitioner *immediately after the reorganization,* and those shares cannot be used in computing the amount of the reduction in the operating loss carryover.

Petitioner also contends that the reduction provided under section 382(b)(1) and (2) is not required because of the exception provided in paragraph (3) of subsection (b). Paragraph (3) provides that the limitation in subsection (b) shall not apply " if the transferor corporation and the acquiring corporation are owned substantially by the same persons in the same proportion."

We find no guide either in the legislative history of this provision or in any decided case as to just what was meant by the word "substantially" as used in this paragraph, or just what this provision was intended to cover. We surmise that it was inserted to avoid application of the mechanical test provided in paragraph (2) where both corporations involved in a reorganization were for all practical purposes owned by the same persons in the same proportions before the reorganization so that it would make little difference how much stock of the acquiring corporation was issued to the transferor corporation or its stockholders under the plan of reorganization, because the same persons

who suffered the losses would be getting the benefit of the carryover in the same proportions as the losses were incurred. Such was the situation in *James Armour, Inc.*, 43 T.C. 295, where this Court recognized that a transaction wherein one corporation transferred certain of its assets to another corporation without receiving shares of the transferee nevertheless qualified as a section 368(a)(1)(D) reorganization, saying:

However, the petitioners already owned all the stock of Excavating and it was not necessary that further stock be issued in order that they might retain their same proprietary interest in the assets received by Excavating. The issuance of further stock would have been a meaningless gesture, and we cannot conclude that the statute requires such a vain act. * * *

But the situation is not the same here because before the merger Hertzmark had no proprietary interest in the corporation which sustained the loss but immediately after the merger he had a 21.74-percent interest in the corporation which seeks to utilize the loss carryover for tax purposes. Before the merger Hertzmark had no interest in Tri-City but had a 25-percent interest in petitioner. Also before the merger Paul Densen and Abbot Greene each had a 41.94-percent interest in Tri-City but only a 29.66-percent interest in petitioner; and immediately after the merger they each had a 31.20-percent interest in petitioner.

"Substantially" is a relative term and, in the absence of a statutory definition thereof, we must consider it in the context in which it is used and give it a meaning which we think will be consonant with the purpose of Congress in enacting the particular statute in which the term is used.

In his regulations dealing with this provision, sec. 1.382(b)–1(d)(2), Income Tax Regs., respondent does not attempt to define the term specifically but does state that the transferor corporation and the acquiring corporation will be considered as owned substantially by the same persons only if the same persons own substantially all the stock of the corporations in substantially the same proportion. He then illustrates the rule by several examples. In example (1), A and B each own 50 percent of the fair market value of the stock of the transferor corporation, in a reorganization to which section 381(a) applies, and A owns 52 percent and B owns 48 percent of the fair market value of the stock of the acquiring corporation. The exception provided in section 382(b)(3) is said to apply. But in example (2), where A and B each own 50 percent of the transferor corporation but A owns 60 percent and B owns 40 percent of the acquiring corporation, the exception is said not to apply. If example (2) in the regulations is a correct illustration of the meaning of section 382(b)(3), then the exception provided in that section would not be applicable here because there was a deviation of more than 20 percent in the ownership of the stock of Tri-City and petitioner.

Petitioner argues that because of the percentage of ownership the Densen and Greene families had in both corporations, and the restrictions attached to the stock held by Hertzmark, the Densens and Greenes had substantial control of both corporations and this should satisfy the requirements of section 382(b)(3). The fallacy in this argument is that section 382(b)(3) does not deal with "control," but rather with common and proportionate ownership of the proprietary interests in both corporations.[7] In this context we cannot conclude that both petitioner and Tri-City were owned substantially by the same persons in the same proportions within the meaning of this section so as to make the exception applicable.

Petitioner contends that because the stockholders of Tri-City had control of petitioner before the merger and could have terminated Hertzmark's employment at any time and forced him to sell his stock to petitioner or to them, this in effect gave them an option to acquire Hertzmark's stock at any time and was tantamount to ownership of his stock for purposes of this section; at least, they argue, the Hertzmark stock should not be considered in determining whether the section is applicable. We do not view the situation that way. There obviously was a sound business reason for selling the stock to Hertzmark in the first place. He paid what would appear to have been a computed value for it and while he continued to hold it he had all the incidents and attributes of full ownership of the stock. It would also appear that petitioner's other stockholders had no intentions of terminating Hertzmark's employment and forcing a sale of his stock because soon after the merger, petitioner and Hertzmark entered into a new employment agreement which specifically recognized his ownership of the stock and provided for a continuance of his 25-percent interest in the assets and business of petitioner, exclusive of the Tri-City division. While this might indicate that an effort was being made to provide a 100-percent continuity of interest in the same persons in the assets and business of Tri-City after the merger, the operating loss carryover that is available to petitioner will be a deduction against the entire income of petitioner, not just the income from the Tri-City division.

While we have some doubt that the purpose of imposing the limitation or reduction provided for in section 382(b)(1) and (2) was to limit the availability of the carryover in situations such as that before us, where there was no purchase of stock to obtain the full tax advantage of the loss carryover, it would nevertheless be second-guessing Congress on our part to ignore a part of the language used by Congress for that reason alone. An effort was made by Congress in enacting

---

[7] The examples in the regulations last cited above deal with "substantially" in terms of fair market value of the corporate stock. But see fn. 6.

sections 381 and 382 to bring some order out of the chaos in this area of the law and to liberalize the carryover of operating losses where the owners of the corporation which suffered the losses had a continuing proprietary interest in those losses or the business that produced them. A mechanical formula was adopted to accomplish that result, which appears to be quite fair to the taxpayers. An exception was provided where the mechanical requirement could not be met but where there was no real change in ownership of the business that produced the loss. Our best judgment is that the exception should be, and was intended to be, rather narrowly confined and applied to avoid the uncertainties of the past.

We conclude that the total net operating loss carryover from prior taxable years of Tri-City to the first taxable year of petitioner ending after the date of the merger shall, subject to the conditions and limitations specified in section 381(b) and (c), be reduced by 35 percent, so that petitioner, in computing its net operating loss deduction, may take into account 65 percent of Tri-City's net operating loss carryover.

*Decision will be entered under Rule 50.*