WORLD SERVICE LIFE INSURANCE COMPANY, as Corporate Successor to Stockman National Life Insurance Company, Plaintiff-Appellee,

v.

UNITED STATES of America, Defendant-Appellant.

No. 72–1169.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 17, 1972.

Decided Jan. 8, 1973.

Richard W. Halberstein, Asst. U. S. Atty., Sioux Falls, S. D., for appellant.

George A. Bangs, Bangs, McCullen, Butler, Foye & Simmons, Rapid City, S. D., for appellee.

Before LARAMORE, United States Court of Claims Senior Judge, and BRIGHT and ROSS, Circuit Judges.

LARAMORE, Senior Judge.

We are called upon in this case to review the question of whether the corporate taxpayer herein was entitled to certain net operating loss carryovers from a corporation which it acquired in a "taxfree" reorganization pursuant to section 368(a)(1)(C).[1] Resolution of this question ultimately devolves to the validity of Treasury Regulation § 1.-382(b)–1 (a)(2).

Plaintiff-Appellee, World Service Life Insurance, is the corporate successor to Stockman National Life Insurance Company and will be referred to herein as "Stockman". Denver National Life Insurance Company, the acquired corporation in the corporate reorganization giv-

---

1. All sections refer to the Internal Revenue Code of 1954, unless otherwise stated.

ing rise to this litigation, will be referred to herein as "Denver". In 1965, Stockman acquired all of the operating assets of Denver in exchange for 606,925 shares of its newly issued common voting stock, representing 23.6 per cent of the fair market value of all shares then issued and outstanding in Stockman. The Stockman shares so received by Denver were not distributed to Denver's shareholders. Instead, Denver, having ceased to do business as a life insurance company, changed its name and existed thereafter as a holding company, solely for the purpose of retaining ownership and control over the block of Stockman shares. The government concedes that this exchange was a valid "Type C" reorganization within § 368(a)(1)(C); hereinafter, referred to as a "C Reorg".

At the time Stockman acquired the assets of Denver, the latter had substantial losses from operations which, because of the economic integration of these two corporations per § 368(a)(1)(C), became available to Stockman by virtue of § 381, subject to the "operating rules" of § 381(b) and certain limitations imposed by §§ 381(c) & 382.[2] The government contends that Denver's losses are reduced to zero in the hands of Stockman by the operation of § 382(b), as interpreted by Treasury Regulation § 1.382(b)–1 (a)(2).

Stockman, in accordance with the holding of the District Court, maintains that the regulation goes beyond the statutory language of section 382(b) and is contrary to the Congressional intent, and as a result is invalid. For the reasons set out herein, we affirm the District Court's holding.

Section 382 imposes special limitations on net operating loss carryovers which would otherwise be available to the sur-

viving corporation under section 381. Subsection (b) of section 382 is concerned with the "change of ownership as the result of reorganization." In pertinent part, section 382 provides that if

> * * * the stockholders * * * of [the loss] corporation * * *, as the result of owning stock of the loss corporation, own (immediately after the reorganization) less than 20 percent of the fair market value of the outstanding stock of the acquiring corporation, [then] the total net operating loss carryover from prior taxable years of the loss corporation to the first taxable year of the acquiring corporation ending after the date of transfer shall be reduced by the percentage determined under paragraph (2).

Paragraph (2) then goes on to provide for the reduction of such loss carryover by five percent for each point under 20 percent that the stockholders of the loss corporation receive in the fair market value of stock of the acquiring corporation.[3]

As an interpretation of this statutory language, Regulation section 1.382(b)–1(a)(2) states:

> * * * the stockholders (immediately before the reorganization) of a transferor-loss corporation shall not be regarded as owning, immediately after the reorganization, any stock of the acquiring corporation which is not distributed to such stockholders pursuant to the plan of reorganization.

It is thus the position of the regulation that the stockholders of the loss corporation do not "own" the stock of the acquiring corporation unless there is an actual distribution of that stock by the loss corporation to its individual

---

2. Section 812 provides for an "operations loss deduction", which is the life insurance company's equivalent of the "net operating loss deduction" (§ 172). Sections 381 and 382 are made applicable to operations losses of insurance corporations via § 381(c)(22). Throughout this opinion we will be referring to "operations loss carryovers" as equivalent to "net operating loss carryovers".

3. Thus, for example, if the loss corporation shareholders were to receive only 10 percent of the acquiring corporation's stock in the reorganization, then the net operating loss carryover would be re-reduced by 50 percent.

shareholders. Such an actual distribution was not present here, but Stockman contests its necessity. Although Stockman has divested itself of a substantial proportion of its ownership in acquiring Denver's assets in this reorganization, the construction of this subsection which the government would have us find is, in effect, that the significant change in ownership is immaterial here, as the Denver shareholders chose to hold their newly acquired stock interest in their former corporate shell rather than on an individual basis. An examination of the applicable law reveals that such a construction cannot be sustained.

■ We note at the outset that this is a case of first impression. Section 382(a) has generated considerable litigation, but such has not been the case with section 382(b).[4] As the District Court observed, if this regulation is a reasonable interpretation of the statute and as such does not distort the intent of Congress, then it must be sustained and the taxpayer's claim for refund denied. Bingler v. Johnson, 394 U.S. 741, 89 S. Ct. 1439, 22 L.Ed.2d 695 (1969); McMartin Industries, Inc. v. Vinal, 441 F. 2d 1274 (8th Cir. 1971). However, if the regulation adds to or subtracts from the intended Congressional interpretation, then it must be held invalid. General Electric Company v. Burton, 372 F. 2d 108 (6th Cir. 1967).

In contending that the regulation is a reasonable and consistent interpretation of the statute, the government makes essentially two arguments. First, appellant contends that the repeated use of the terms "shareholders" and "stockholders" in the statute and the Committee Reports, when the terms "corporation" or "loss corporation" might have been used alone, indicates an intention that the holdings of the loss corporation's shareholders, not those of the corporate entity itself, be examined to determine whether the statutory 20 percent test has been met.

■ While at first blush this assertion bears some persuasion, we are reminded of the words of Judge Learned Hand:

There is no more likely way to misapprehend the meaning of language—be it in a constitution, a statute, a will or a contract—than to read the words literally, forgetting the object which the document as a whole is meant to secure. Nor is a court ever less likely to do its duty than when, with an obsequious show of submission, *it disregards the overriding purpose because the particular occasion which has arisen, was not foreseen.* That there are hazards in this is quite true; there are hazards in all interpretations, at best a perilous course between dangers on either hand; but it scarcely helps to give so wide a berth to Charybdis's maw that one is in danger of being impaled upon Scylla's rocks. [Central Hanover Bank & Trust Co. v. Commissioner, 159 F.2d 167, 169 (2d Cir. 1947); (emphasis added)].

Consequently, we concur in appellee's contention that the true intent of Congress, with respect to the transfer of loss carryovers from one corporate entity to a successor in a corporate reorganization, must be examined from the viewpoint of the entire statutory pattern. This includes sections 269, 381, 382 and, by necessary reference, sections 368, 361 and 354.[5]

■ As noted by the District Court, the Congressional Committee Reports indicated that section 269 was "designed to put an end promptly to any market

---

4. Little, if any light is shed on this case by Commonwealth Container Corp., 48 T.C. 483 (1967), aff'd, 393 F.2d 269 (3d Cir. 1968), as that case involved the applicability of section 382(b)(3), which provides that the percentage limitation shall not apply if the transferor-loss corporation and the acquiring corporation are owned substantially by the same persons in the same proportion.

5. Congressional policy on this subject is also reflected indirectly in the underlying principles of sections 446(b), 482 and 1551.

for, or dealings in, interests in corporations or property which have as their objective the reduction through artifice of the income or excess profits tax liability." H.R.Rep.No.871, 78th Cong., 1st Sess. 49 (1943). The government has not contended, as clearly it cannot, that section 269 is applicable here, as there is no suggestion whatsoever that the "principal purpose" of Stockman's acquisition of Denver was the avoidance of Federal income taxes, *i. e.,* by means of utilization of the available loss deduction.

Sections 381 and 382 were added to this statutory scheme in 1954 in an effort to "protect taxpayers against the loss of favorable tax attributes, as well as to prevent the avoidance of unfavorable ones by paper reorganizations." Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders, (3d ed.) 16–14. The congressional policy underlying the enactment of section 381 is exhibited in House Ways and Means Committee Report which states:

> The new rules enable the successor corporation to step into the "tax shoes" of its predecessor corporation without necessarily conforming to artificial legal requirements which now exist under court-made law. Tax results of reorganizations are thereby *made to depend less upon the form of the transaction than upon the economic integration of two or more separate businesses into a unified business enterprise.* At the same time the new provision makes it difficult to escape the tax consequences of the law by means of a legal artifice such as liquidation and reincorporation or merger into another corporation. [H.R.Rep. No.1337, 83d Cong., 2d Sess. 41 (1954), reprinted at 3 U.S.C.Cong. & Adm.News (1954) p. 4067; emphasis added.]

In explaining the addition of section 382(b), the Senate Committee Report noted that it was designed to reduce the net operating loss carryovers of the transferor corporation *"unless there is a 20 percent or more continuity of interest in the resulting corporation . . . with the net operating loss carryovers."* S.Rep.No.1622, 83d Cong., 2d Sess. 284 (1954), reprinted at 3 U.S.C.Cong. & Adm.News (1954) p. 4923.

Although this mechanical 20 percent test is usually discussed by the Committee Reports in terms of shareholder's ownership, it is pertinent to note that the reports are devoid of any mention of the necessity for an actual distribution of the acquired stock following a C Reorg. This fact is of considerable significance in light of two crucial factors. First, in a C Reorg the transferor-loss corporation (Denver) is entitled to remain in existence following the reorganization. As a result, Denver was not required to liquidate or distribute the Stockman shares to qualify as a valid C Reorg. This fact was first recognized by the Supreme Court in Helvering v. Minnesota Tea Co., 296 U.S. 378, 56 S. Ct. 269, 80 L.Ed. 284 (1935), after consideration of the basic continuity of interest principles. While section 368 has been the subject of several important revisions and modifications since the *Minnesota Tea* decision in 1935, Congress has continued to permit the survival of the transferor corporation in a C Reorg, as it has obviously found that the underlying continuity of interest principles are satisfied despite the lack of liquidation and actual distribution of the acquired stock to the transferor's individual stockholders. Moreover, Revenue Ruling 68–358, 1968–2 Cum.Bull. 156, indicates, when read in contrast to Revenue Ruling 57–518, 1957–2 Cum.Bull. 253, that continuation of the transferor as a "holding company," as here, is one of the most acceptable purposes for such survival. The purpose of this survival is otherwise strictly limited by section 368(a)(1)(C)'s "substantially all" requirement. (*See* Rev.Rul. 57–518, *supra.*)[6]

---

6. The fact that the purposes for the transferor's continued existence are strictly limited probably accounts for the fact that very few transferor corporations continue to exist after a reorganization.

The importance of the transferor corporation's receipt of the acquiring corporation's stock being sufficient in and of itself to satisfy the requisite underlying principles of continuity of interest in a C Reorg lies in the fact that the 20 percent test of section 382(b) is also based on continuity of interest principles. (*See* Senate Committee Report quoted, *supra*.) Thus, we are not persuaded by appellant's further contention that the underlying principles of continuity of interest cannot be fulfilled absent an actual distribution of the acquired stock to the transferor's shareholders. The statutory scheme, as well as the committee reports, discloses instead that the necessary structure and form of the continuity of interest is a function of sections 368, 354, 355 and 356, while section 382(b) is concerned with the *quantum* of the continued interest. We cannot accept that Congress would so casually set out an additional requisite for continuity of interest in a C Reorg, *i. e.*, distribution of the stock, without some mention of it in the committee reports.

That section 382(b) cannot be interpreted as necessitating this additional step for satisfaction of continuity of interest in the case of a C Reorg is all the more evident in view of the fact that the applicability of sections 381 and 382 to a D Reorg is expressly contingent on there being an actual distribution of all stock, securities and other properties of the transferor to its shareholders. (*See* section 381(a)(2) parens and section 354(b)(1)(B).) Thus, in the case of D Reorgs, Congress was insistent that the resultant stock be distributed to the shareholders and it so provided, plainly and explicitly. It is reasonable to infer that if Congress had similarly wished to make the applicability of section 381 to C Reorgs dependent on such an actual distribution that it would have done so

in a like manner. This is particularly true since such a distribution is not otherwise necessary to constitute a valid C Reorg.

Furthermore, the government has not presented, nor can we discern, any reasons why the continuity of interest requirements for a C Reorg should be any more stringent for purposes of section 382(b) than they are for initially qualifying as a C Reorg.[7] In this regard, it is pertinent to note that if there had been an actual distribution, the Denver shareholders would have been entitled to place said stock in a voting trust or even recontributed the stock to a holding company, as was, in effect, done here. Such fact further demonstrates that there is no valid objection to a combining of their stock interest and that there is no apparent abrogation of section 382(b)'s continuity of interest doctrine in allowing the acquired stock to remain at the corporate level initially.

Since there is no valid objection to such a combination of their stock interest, we are further persuaded that our determination should be guided by the substantive effect of the Denver action, rather than by inconsequential legal form. Such an analysis is forecasted by the Senate Finance Committee's statement that "whether or not the items carryover should be based upon *economic realities* rather than upon such artificialities as the legal form of the reorganization." S.Rep.No.1622, 83d Cong., 2d Sess. 275 (1954), reprinted at 3 U.S. C.Cong. & Adm.News (1954) p. 4683 (emphasis added). The economic realities of the situation compel the conclusion that Denver's shareholders were the owners of a continuing interest in their assets, as stock in their holding company only represented an interest in Stockman. It is apparent that this underlying economic reality was the determinative finding which brought Congress to the conclusion that liquidation or distri-

---

7. We do note, however, that Congress had good reasons for differentiating its treatment of D Reorgs and necessitating an actual distribution in that case, as the latter are essentially "devisive" reorganizations, while the C Reorg is a "unifying" reorganization.

bution was not necessary for continuity of interest principles in a C Reorg, and it is equally apparent that such realities are applicable here to fulfill the requisite standards of continuity of interest for section 382(b). We must conclude that the government asks us to draw a distinction here where there is, in fact, no difference.

Moreover, consideration of the business purposes of Denver's retention of the stock discloses the economic realities of the extent of Denver's continuity of interest. It is uncontested that Denver's shareholders elected to retain the Stockman shares at the corporate level so as to have greater influence over the future policies and operations of Stockman, thereby providing greater protection of their interest in the taxpayer than if the shares had been distributed to the individual Denver stockholders. Thus, the Denver shareholders who suffered the loss from which the tax benefit arose not only retained, but actively exercised, a continuing interest in the surviving corporation, as they were subsequently able to elect five members of Stockman's 21-man board of directors. Such concerted action by the Denver shareholders is not only consistent with the principles of continuity of interest, but also accords with the basic underlying premise that the "shareholders who have been burned in the course of seeing their investment consumed through losses are entitled to a measure of relief when their corporation is absorbed by other interests." Blake, Carryovers and Limitations on Carryovers of Net Operating Losses in Corporate Acquisitions, 21 NYU Institute on Federal Taxation 1247, 1256. To deny Stockman the net operating loss carryover in this case would serve to deny Denver's shareholders their measure of relief.

While the government contends that an actual distribution of the stocks is necessary, we note further that it has suggested neither specific abuses which are prevented by such distribution nor any valid objectives to be achieved. As already noted, such distribution is not necessary for satisfaction of continuity of interest principles, and in fact the shareholders' interest may achieve greater protection by retaining the stock at the corporate level. We also note that there is no revenue advantage to be achieved in requiring the distributions as Denver's shareholders would be insulated from recognition of gain at the time of the distribution via section 354. In addition, the operation of section 381 serves to transfer all of the tax characteristics of Denver described in section 381(c) to Stockman, notwithstanding the possible limitations of section 382, such that these items were no longer available to Denver, even though it continued to exist. As a result, if the net operating losses of Denver were to be utilized at all, then it had to have been by Stockman or its successors. It would not have been possible, therefore, for Denver to make any further transfer of these tax characteristics.

Finally, the government asserts that none of the specific stock attribution rules are applicable to justify a holding that Denver's shareholders, in effect, constructively owned the 23.6 percent of taxpayer's stock held by Denver. It is their position that Congress made express provisions for stock-attribution and constructive ownership, e. g., sections 318 and 382(b)(5), in circumstances where it decided that such an attribution rule was justified. The error of this argument is in its presumption of the validity of that which it attempts to prove, i. e., that personal ownership of the acquired stock by the transferor's shareholders is necessary. Since we have concluded that such actual possession and personal ownership are neither required by the statute nor intended by Congress, the lack of an applicable constructive ownership rule is immaterial.

■ In view of the foregoing, we find that an actual distribution was not contemplated by Congress in instances such as here present, and to so require presents an unnecessary step which places form over substance, ignores the economic realities of the reorganization,

and distorts the statutory scheme and manifest intent of Congress in providing for net operating loss carryovers. Such distortion does not consistently interpret the statute and the regulation is, therefore, invalid. Judgment is affirmed.

BRIGHT, Circuit Judge (dissenting).

The decision of the majority creates a tax windfall for a life insurance company by declaring invalid a Treasury Regulation which simply reiterates the statutory language. Code section 382(b) speaks in terms of "stockholders" of the "loss corporation" who, immediately after reorganization, own stock of the acquiring corporation as a prerequisite for the successor or acquiring corporation utilizing a net operating loss carryover of the acquired "loss corporation." If the "stockholders" of the loss corporation immediately before the reorganization own more than 20 percent of the stock of the acquiring corporation immediately after the reorganization, the acquiring corporation is entitled to utilize 100 percent of the net operating loss carryover from the "loss corporation." § 382(b)(2)(A).

It seems to me that the statutory language is quite plain. The term "stockholders" does not mean "corporation."

In this case the record shows two distinct transactions through which taxpayer seeks to utilize the loss deduction:

1) On May 15, 1965, taxpayer's predecessor, Stockman National Life Insurance Company, acquired the assets of Denver National Life Insurance Company (Denver) in exchange for stock. Denver, as a holding company, retained this stock.

2) In 1967, Denver transferred these shares to another insurance company in exchange for its stock and the newly-acquired stock was then distributed to Denver's shareholders in a liquidation of Denver.

These transactions do not fall within the language of the statute since Denver, the "loss corporation," *not its stockholders*, owned more than 20 percent of the stock of the acquiring corporation at the crucial time specified by § 382(b), i. e., "immediately after the reorganization" carried out on May 15, 1965.

The regulation adds nothing to the express statutory language in explaining that:

[T]he stockholders (immediately before the reorganization) of a transferor-loss corporation shall not be regarded as owning, immediately after the reorganization, any stock of the acquiring corporation which is not distributed to such stockholders pursuant to the plan of reorganization. [Treas.Reg. § 1.382(b)–1(a)(2).]

The prerogative of enacting tax law belongs to Congress. The prerogative of interpreting and supplementing the tax statutes rests with the Commissioner of Internal Revenue. His reasonable regulations which are consistent with the statutory language must be sustained. Bingler v. Johnson, 394 U.S. 741, 89 S. Ct. 1439, 22 L.Ed.2d 695 (1969); United States v. Correll, 389 U.S. 299, 88 S.Ct. 445, 19 L.Ed.2d 537 (1967); Commissioner v. South Texas Lumber Co., 333 U.S. 496, 68 S.Ct. 695, 92 L.Ed. 831 (1948); Exel Corporation v. United States, 451 F.2d 80 (8th Cir. 1971).

I see no reason to overturn a regulation for equitable considerations, as suggested by the majority, nor because the government failed to show Stockman National Life Insurance Company guilty of "bad faith" in the reorganization, as suggested by the opinion of the district court unofficially reported at 71–2 USTC, ¶9748.