**CONSOLIDATED BLENDERS, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. CV 79–0–509.**

United States District Court, D. Nebraska.

Nov. 7, 1984.

---

David R. Klaassen, Salina, Kan., and George C. Svoboda, Fremont, Neb., for plaintiff.

Daniel F. Ross, Washington, D.C., for defendant.

## MEMORANDUM

BEAM, District Judge.

This matter is before the Court upon the plaintiff's objections (filing 17) to the Report and Recommendation of the Magistrate (filing 14) regarding the parties' cross-motions for summary judgment (filings 9 and 11) and plaintiff's request for oral argument (filing 17). Under 28 U.S.C. § 636(b)(1), and Local Rules 49(B) and 44(D), this Court is to make a de novo determination of those portions of the Report and Recommendation to which objections have been made.

The issues before this Court concern the extent the plaintiff is entitled to claim net operating loss carryovers pursuant to Section 382(b) of the Internal Revenue Code of 1954, applicable to plaintiff's tax year ending April 30, 1974, and the extent the plaintiff is entitled to claim investment credit carryovers pursuant to Section 383 of the

Code for the same year.[1] Section 383 provides the same limitations to the investment tax credit carryover as are applicable to the net operating loss carryover under the provisions of Section 382(b). Since the amount of the investment tax credit carryover allowed under Section 383 is dependent upon the Court's interpretation of Section 382(b), this Memorandum will generally speak in terms of net operating loss carryovers under Section 382(b). The Court's holding in regard to Section 382(b) will then be applicable to determine the amount of investment credit carryovers allowable.

The facts in this case are not in dispute and are as agreed to by the parties and as recited in the Pre-trial Order and attached exhibits (filing 8). Briefly, this case concerns the merger of eight corporations with and into Consolidated Blenders, Inc. in a tax-free corporate reorganization under 26 U.S.C. § 368(a)(1)(A). The corporations were variously engaged in farming, grain handling and storage, alfalfa dehydrating and related activities. Consolidated Blenders, Inc. continued these activities after the reorganization.

Six of these corporations at the time of the merger had either a net operating loss (NOL) carryover or an investment credit (IC) carryover. Six of the eight merging corporations were owned directly or indirectly by various members of the Morrison family as set forth in detail in the Pre-trial Order. Four of the six corporations with the contested tax attributes were owned by the Morrison family.

Plaintiff contends that because of the reorganization under Section 368(a)(1)(A), the tax attributes of the several merging corporations became available to the acquiring corporation, Consolidated Blenders, Inc., by virtue of Section 381(a), subject to certain limitations imposed by Section 382(b). Plaintiff argues that for the purposes of determining the limitations imposed by Section 382(b) on carrying over

the tax attributes, that all of the loss corporations should be grouped together, and in the alternative, that at least those four corporations owned by various members of the Morrison family should be grouped together. The government contends that for purposes of Section 382(b), each loss corporation involved in the reorganization must be viewed separately to determine the amount of carryover allowed. The government's position results in a substantial reduction in the amount of the attributes that would pass on to Consolidated Blenders, Inc. because of the reorganization.

The Magistrate agreed with the position of the government. The Magistrate reported that Treasury Regulation § 1.382(b)–1(a)(5), as in effect for the plaintiff's tax year ending April 30, 1974, interprets Section 382(b) limitations to apply to each loss corporation separately, as individual units within the total reorganization. Therefore, in order for the plaintiff to succeed in its contention that the loss corporations are to be grouped together, the plaintiff bears the burden to show that the above regulation is both unreasonable and plainly inconsistent with Section 382(b) of the I.R.S. Code. *See Commissioner v. Portland Cement Co.,* 450 U.S. 156, 169, 101 S.Ct. 1037, 1045, 67 L.Ed.2d 140 (1981). In addition, the Magistrate distinguished *World Service Life Insurance Co. v. United States,* 471 F.2d 247 (8th Cir.1973) [*World Service*] from the case at bar to refute the plaintiff's reliance on that case to support its contentions that the loss corporations should be allowed to be grouped together for purposes of the 20 percent limitation under Section 382(b)(1)(B). The Magistrate recommended that plaintiff's motion for summary judgment (filing 9) and motion for oral argument (filing 10) be denied and defendant's motion for summary judgment (filing 11) be granted.

The plaintiff contends in his objections that the Magistrate erred in (1) relying on Treasury Regulation § 1.382(b)–1(a)(5); (2)

---

1. All references to sections of the Internal Revenue Code, Treasury Regulations, and state statutes are those sections that were in effect during the time period relevant to the lawsuit unless otherwise indicated.

misinterpreting Section 382(b)(1)(B) to require each loss corporation's net operating losses to be analyzed separately in order to determine the extent that the tax attributes are allowable; (3) misinterpreting the "continuity of interest" concept underlying Section 382(b); and (4) failing to consider the beneficial ownership of stock when applying the limitations of Section 382(b)(1)(B) and Section 383.

This case turns on the interpretation of Section 382(b) as it applies to the merger of several loss corporations, some of which are owned by the same family, into a resulting corporation. Section 382(b) provides:

Section 382(b) Change of Ownership as the Result of a Reorganization—

(1) In general.—If, in the case of a reorganization specified in paragraph (2) of section 381(a), the transferor corporation or the acquiring corporation—

(A) has a net operating loss which is a net operating loss carryover to the first taxable year of the acquiring corporation ending after the date of transfer, and

(B) the stockholders (immediately before the reorganization) of such corporation (hereinafter in this subsection referred to as the "loss corporation"), as the result of owning stock of the loss corporation, own (immediately after the reorganization) less than 20 percent of the fair market value of the outstanding stock of the acquiring corporation,

the total net operating loss carryover from prior taxable years of the loss corporation to the first taxable year of the acquiring corporation ending after the date of transfer shall be reduced by the percentage determined under paragraph (2).

(2) Reduction of net operating loss carryover.—

The reduction applicable under paragraph (1) shall be the percentage determined by subtracting from 100 percent—

(A) the percent of the fair market value of the outstanding stock of the ac-

quiring corporation owned (immediately after the reorganization) by the stockholders (immediately before the reorganization) of the loss corporation, as the result of owning stock of the loss corporation, multiplied by

(B) five.

The Treasury Regulation § 1.382(b)–1(a)(5) upon which the Magistrate relied states:

The reduction provided by section 382(b)(1) may apply to the carryovers of more than one corporation a party to the reorganization. For example, assume that X Corporation acquires the assets of Y Corporation and of Z Corporation in a reorganization described in section 381(a)(2) and that both X Corporation and Y Corporation have net operating loss carryovers at the date of the reorganization. The reduction under section 382(b)(1) will apply to the net operating loss carryovers of X Corporation unless the stockholders (immediately before the reorganization) of X Corporation own, immediately after the reorganization, at least 20 percent of the fair market value of the outstanding stock of X Corporation. Similarly, the reduction under section 382(b)(1) will apply to the net operating loss carryovers from Y Corporation unless the stockholders (immediately before the reorganization) of Y Corporation own, immediately after the reorganization, at least 20 percent of the fair market value of the outstanding stock of X Corporation.

It is thus the position of the regulation that when several loss corporations are engaged in a reorganization, the stockholders of each separate loss corporation must meet the 20 percent ownership test, or that Section 382(b)(1) reductions will apply. For the reasons set forth below, the Court agrees with the plaintiff that the Magistrate improperly relied on Treasury Regulation § 1.382(b)–1(a)(5) and that the Magistrate's Report and Recommendation should not be followed.

## I.

The Court does agree with the Magistrate that *World Service* is distinguishable from this case, even though the Court in *World Service* was also concerned with the validity of a regulation promulgated pursuant to Section 382(b). However, *World Service* was a case of first impression just as is this case and the technique the Court employed to test the validity of the regulation in *World Service* can be used here to test the validity of the regulation.

The Court noted in *World Service*, 471 F.2d at 250, that "[s]ection 382(a) has generated considerable litigation, but such has not been the case with section 382(b)." This is still true. Both *Commonwealth Container Corp. v. Commissioner*, 48 T.C. 483 (1967), *aff'd*, 393 F.2d 269 (3rd Cir. 1968) and *Kern's Bakery of Virginia, Inc. v. Commissioner*, 68 T.C. 517 (1977) concern the particular application of Section 382(b)(3) not Section 382(b)(1). Even *World Service* itself concerns an interpretation of a different portion of Section 382(b)(1) than is at issue in this case. The cases shed little direct light on the case at bar.

■ But as stated before, *World Service* does recite the correct standard for testing the validity of a Treasury Regulation:

> [I]f this regulation is a reasonable interpretation of this statute and as such does not distort the intent of Congress, then it must be sustained and the taxpayer's claim for refund denied. *Bingler v. Johnson*, 394 U.S. 741 [89 S.Ct. 1439, 22 L.Ed.2d 695] (1969); *McMartin Industries, Inc. v. Vinal*, 441 F.2d 1274 (8th Cir.1971). However, if the regulation adds to or distracts from the intended Congressional interpretation, then it must be held invalid. *General Electric Co. v. Burton*, 372 F.2d 108 (6th Cir. 1967).

*World Service*, 471 F.2d at 250.

Initially, the plaintiff argues that the regulation does not support the Magistrate's conclusion because it must be read in conjunction with Treasury Regulation § 1.382(b)–1(a)(2), a regulation that was held invalid in *World Service*, 471 F.2d at

253. The Court is not persuaded by this argument.

First, Treasury Regulation § 1.382(b)–1(a)(5) does not need to be read in conjunction with Treasury Regulation § 1.382(b)–1(a)(2) to reach the conclusion that each loss corporation is to be considered separately. The regulation stands by itself. Second, in *World Service*, the Court was concerned with the specific definition of "to own" as required by Section 382(b) and the more burdensome definition of "to own" embodied in Treasury Regulation § 1.382(b)–1(a)(2). The Court found that the Treasury had improperly added, contrary to the intent of Congress, the requirement that stock be distributed to its shareholders in a Type C reorganization in order for the shareholders to be considered owners of the stock. *World Service*, 471 F.2d at 253. The Court in *World Service* did not address that additional section of the regulation that recites the specific words of Section 382(b), "as a result of owning stock of the loss corporation." Rather, the Court in *World Service* only held that distribution is not required for ownership. 471 F.2d at 253. In this respect *World Service* is not direct support for the plaintiff's argument that Treasury Regulation § 1.382(b)–1(a)(5) does not comport with the intent of Congress by adding or subtracting from Section 382(b). Plaintiff has not proved that the regulation is both unreasonable and plainly inconsistent with Section 382(b) through this argument.

## II.

■ However, the Court does find that the plaintiff has successfully proved that Treasury Regulation § 1.382(b)–1(a)(5) is invalid because it distorts what Congress intended to accomplish under Section 382(b). The Treasury Regulation, the government's contentions and the Magistrate's Report and Recommendation impose a more onerous burden on the taxpayer than Congress intended when it codified the objective 20 percent continuity of interest requirement into Section 382(b). The Court finds both valid and persuasive the

plaintiff's contentions that Treasury Regulation § 1.382(b)–1(a)(5) and the government's position misinterprets Section 382(b)(1)(B) to require each loss corporation's net operating losses to be analyzed separately in order to determine the extent the tax attributes are allowable. Such a meaning is a misinterpretation of the "continuity of interest" concept underlying Section 382(b).

### A.

After a cursory glance at Section 382(b), the argument that the section requires each individual loss corporation to be regarded separately seems reasonable. However, it is necessary to step back and consider the proper function of a court when interpreting a statute. As the United States Supreme Court has stated:

> In the interpretation of statutes, the function of the courts is easily stated. It is to construe the language so as to give effect to the intent of Congress....
>
> There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purposes of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' this Court has followed the purpose rather than the literal words.

*United States v. American Trucking Ass'n*, 310 U.S. 534, 542–43, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345 (1940).

In *World Service*, the Eighth Circuit quoted Judge Learned Hand:

> There is no more likely way to misapprehend the meaning of language—be it in a constitution, a statute, a will or a contract—than to read the words literally, forgetting the object which the document as a whole is meant to secure. Nor is a court ever less likely to do its duty than when, with an obsequious show of submission, *it disregards the overriding purpose because the particular occasion which has arisen, was not foreseen* [emphasis added] [citations omitted].

*World Service*, 471 F.2d at 250.

Another court with regard specifically to taxing statutes noted:

> Taxing statutes must be applied within reasonable limits and construed in the light of their purpose. One designed to prevent tax avoidance may, under some circumstances, be liberally construed in favor of the taxpayer, by confining its scope to the object of its creation.

*Musselman Hub-Brake Co. v. Commissioner*, 139 F.2d 65, 67 (6th Cir.1943).

In this case the words of the statute alone are not sufficient in and of themselves to determine the proper application of Section 382(b). The statute is written in the singular. However, this case involves eight corporations merging into one corporation in a single, valid reorganization. In such a transaction, to apply the language of Section 382(b) in isolation from related statutes is to reach an absurd result contrary to the purpose of the statutory scheme concerning NOL carryovers.

### B.

In view of this, the Court finds that the intent of Congress must be gleaned from analyzing a combination of the statutory language and legislative history of Sections 269, 381 and 382 relating to NOL carryovers.

As the Eighth Circuit in *World Service* noted, the Congressional Committee Reports state that the purpose of Section 269 was "to put an end promptly to any market for, or dealings in, interests in corporations or property which have as their objective the reduction through artifice of the income or excess profits tax liability." *World Service*, 471 F.2d at 251, *citing* H.R. Rep. No. 871, 78th Cong., 1st Sess. 49

(1943). The government has not argued that Section 269 is applicable to this case since there is no hint whatsoever that the "principal purpose" of the merger of the eight corporations into Consolidated Blenders, Inc. was the avoidance of federal income taxes by means of utilization of the available NOL carryovers.

"Sections 381 and 382 were added to this statutory scheme in 1954 in an effort to 'protect taxpayers against the loss of favorable tax attributes, as well as to prevent the avoidance of unfavorable ones by paper reorganizations.'" *World Service,* 471 F.2d at 251, *citing Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders* 14–16 (3rd ed.). The House Report 1337 describes the purpose of these provisions as follows:

Present law makes no provisions for the transfer from one corporation to another, in a tax-free merger or consolidation, of the major tax benefits, privileges, elective rights and obligations which were available to the predecessor. These include such items as carryovers ...

As a result, present practice rests on court-made law which is uncertain and frequently contradictory. Moreover, *whether or not the carryover is allowed should be based upon economic realities rather than upon such artificialities as the legal form of the reorganization....*

The new rules [Section 381] enable the successor corporation to step into the 'tax shoes' of its predecessor corporation without necessarily conforming to artificial legal requirements which now exist under court-made law. Tax results of reorganizations are thereby made to depend less upon the form of the transaction than upon the economic integration of two or more separate businesses into a unified business enterprise....

This special limitation [Section 382] on net operating loss carryovers provides an *objective standard* governing the availability of a major tax benefit which has been abused through trafficking in corporations with operating loss carryovers,

the tax benefits of which are exploited by persons other than those who incurred the loss. It treats a business which experiences a substantial change in its ownership, to the extent of such change, as a new entity for such tax purposes. [Emphasis added].

H.R.Rep. No. 1337, *reprinted in 3 U.S. Code Cong. & Ad.News* 4017, 4066–67 (1954).

Further explanation of Section 382 is offered in Senate Report 1622:

Your committee also limits the allowance of net operating loss carryovers as a result of a tax-free reorganization. Your committee considers it appropriate to allow such carryovers in full only when the shareholders of the predecessor loss corporation have a *substantial continuing interest* in the successor corporation. Thus, if the shareholders of *the old loss corporation have 20 percent of the stock of the new corporation* the loss carryover is available to the new corporation without diminution.

Sub-section (b) [Section 382(b)] is designed to prevent the liberalized carryover of net operating losses permitted in Section 381 from being used by one corporation to acquire the total net operating loss carryovers of another corporation without giving up at least a 20 percent share to the stockholders of the corporation with a net operating loss carryover. If the stockholders of the loss corporation have a 20 percent or more interest in the successor corporation, it is felt that there is a sufficient continuity of interest in the net operating loss carryover to justify permitting the entire net operating loss to carry over....

Paragraph (3) [Section 382(b)(3)] provides that the limitations in subsection (b) shall not apply if the transferor corporation and the acquiring corporation are owned substantially by the same persons in the same proportions.... [Emphasis added].

S.Rep. No. 1622, *reprinted in 3 U.S.Code Cong. & Ad.News* 4684, 4924–25 (1954).

On the basis of the legislative history, Section 381 was codified to liberalize and clarify the use of NOL carryovers in tax-free reorganizations. Section 382(b) was enacted to preclude 100 percent utilization of the tax attributes in such reorganizations unless the acquiring corporation gives up 20 percent control to stockholders of the acquired corporation or unless the acquired corporation is owned substantially by the same persons in the same proportions before and after the reorganization. (The latter criterion is contained in Section 382(b)(3) and is not at issue here.)

### C.

The history of Section 382 speaks in terms of an objective standard against which to measure the quantum of substantial continuing shareholder interest required in order for tax attributes to be totally utilized in a reorganization. In addition, it is clear that the intent of Congress, through its enactment of the NOL carryover scheme, was not to have the economic realities of a transaction disregarded. When these two basic ideas are considered with regard to this case, it is clear that the NOL carryovers and IC carryovers should be available to Consolidated Blenders, Inc. Though the United States and the Treasury Regulation contend otherwise, to allow the aggregation of the loss corporations is not inconsistent with the intent of Congress, nor does it render the 20 percent test a nullity.

The numeric standard is not particularly high. Congress was willing to allow full utilization of the tax attributes when a mere 20 percent control of the acquiring corporation was given in return for the shares of the loss corporation. In this case when the loss corporations are aggregated,

Consolidated Blenders, Inc. gave up 42.-4962 percent control to the stockholders that formerly owned stock in the aggregated loss corporations.[2] The stockholders using these tax benefits are the same persons who incurred the loss. *Compare, 3 U.S. Code Cong. & Ad.News* 4067 (1954) (abusive practice when tax benefits are exploited by persons other than those who incurred the loss).

The objective standard was intended by Congress to be available as a shield to the taxpayer as well as a sword to the Tax Commissioner. *See World Service,* 471 F.2d at 251. It aids in tax planning to know that when certain objective standards are met, certain tax results will occur. In a valid two corporation tax-free reorganization, a transfer of at least 20 percent of the stock of the acquiring corporations will act as a shield that preserves the tax benefits. However, in a valid reorganization of more than five loss corporations, the objective standard becomes solely a sword to the Tax Commissioner against one or more of the corporations if the loss corporations are not allowed to aggregate the percentage of shares they received in the acquiring corporation as a result of the reorganization.

By interpreting Section 382(b) to allow the loss corporations to be aggregated, the objective standard remains intact. The acquiring corporation must be willing to relinquish at least 20 percent of its shares to benefit fully from the tax attributes in a reorganization. The 20 percent standard applies to the shares of the acquiring corporation received by the loss corporation stockholders as a result of the reorganization on account of their owning stock in the loss corporation. Stock acquired otherwise may not be counted.[3]

---

**2.** *See* note 4 *infra.*

**3.** This matter has been settled. *Kern's Bakery of Virginia, Inc. v. Commissioner,* 68 T.C. 517 (1977). (Acquiring corporation could only use a part of the NOL carryovers of the acquired loss corporation because stockholders of the loss corporation only received 10 percent of the acquiring corporation's stock for their stock in the acquired loss corporation as a result of the

reorganization. This was the result, even though, the loss corporation's shareholders had interest in other non-loss corporations that were also parties to the merger and received overall 50 percent of the stock of the acquiring corporation as a result of the reorganization.) *Commonwealth Container Corp. v. Commissioner,* 48 T.C. 483 (1967), *aff'd,* 393 F.2d 269 (3rd Cir. 1968). (Shareholders of loss corporation received 13 percent of the acquiring corporation's

■ In this particular case, the stockholders of the six loss corporations acquired 78.8337 percent of the capital stock of Consolidated Blenders, Inc. as a result of the corporate reorganization, and such stockholders acquired 42.4962 percent of the capital stock of Consolidated Blenders, Inc. on account of their ownership of stock of the loss corporations which were parties to the corporate reorganization.[4] The stockholders of the four corporations with investment tax credits acquired 15.7505 percent of the capital stock of Consolidated Blenders, Inc. on account of their ownership of stock of the investment tax credit corporations that were parties to the corporate reorganization.[5]

Consolidated Blenders, Inc. is entitled to the full benefit of the NOL carryovers because 42.4962 percent relinquishment of control surpasses the 20 percent requirement. However, the amount of IC carryovers allowed will have to be reduced in accordance with Section 382(b)(2) since the 15.7505 percent amount of stock received as a result of the reorganization from owning stock in the investment credit corporation is less than the 20 percent standard.

As an epilogue, the Court notes that it is ludicrous to read Section 382(b) to require each loss corporation to meet the 20 percent standard separately when there is a single reorganization as occurred here. As

the plaintiff noted, such an interpretation creates an irrebuttable presumption that no more than five loss corporations can ever be validly merged in one reorganization without losing use of NOL carryovers. Under the amended Section 382(b) such an interpretation would conclusively presume that no more than two corporations can merge in one reorganization and still benefit from unused tax attributes.[6] The Court agrees with the plaintiff that "nothing exists in the language of the statutes, or in their background or legislative history to indicate a Congressional intention or purpose to condemn or prevent such multiple mergers, nor to reduce the tax benefits otherwise available in the event of such a multiple merger." (Plaintiff's Reply Brief at 6.) In fact it is the contrary. Simplification in business enterprises is encouraged. The reorganization of the eight corporations into Consolidated Blenders, Inc. was a valid single reorganization under Section 368(a)(1)(A) that occurred in accordance with relevant state law. (*See Neb.Rev. Stat.* §§ 21–2070 *et seq.; Kan.Stat.Ann.* §§ 17–6701 *et seq.; Colo.Rev.Stat.Ann.* §§ 7–7–101 *et seq.*) The Commissioner still can use Section 269 to disallow tax benefits if mergers of several small loss corporations start to occur for the principal purpose of avoiding Federal Income Tax.

stock as a result of owning stock in the loss corporation. Because of this, the acquiring corporation was permitted to use only a portion of the NOL carryover, in spite of the fact after the merger the same shareholders owned 79 percent of the acquiring corporation.)

**4.** Paragraph 8 of Section B of the Pre-trial Order (filing 8) shows that the stockholders of the loss corporations received 42.4962 percent of the capital stock of Consolidated Blenders, Inc., as the result of owning stock of the loss corporations, as follows:

| Loss Corporation | Percent |
|---|---|
| CH Farms, Inc. | 17.9523 |
| Kendale Farms, Inc. | 8.7928 |
| Nu-Pro Products, Inc. | 2.1973 |
| Stanton Milling Co., Inc. | 6.3274 |
| F. J. Higgins Milling Co. | 3.6129 |
| Higgins Warehouse Co. | 3.6129 |
| TOTAL: | 42.4962 percent |

**5.** Paragraph 8 of Section B of the Pre-trial Order (filing 8) shows that the stockholders of the investment credit corporations received 15.7505 percent of the capital stock of Consolidated Blenders, Inc., as the result of owning stock of the investment credit corporations, as follows:

| Investment Credit Corporation | Percent |
|---|---|
| Nu-Pro Products, Inc. | 2.1973 |
| Stanton Milling Co., Inc. | 6.3274 |
| F. J. Higgins Milling Co. | 3.6129 |
| Higgins Warehouse Co. | 3.6129 |
| TOTAL: | 15.7505 percent |

**6.** 26 U.S.C. § 382(b)(1) as amended by the Tax Reform Act of 1976. The objective standard is raised from 20 percent to 40 percent of the acquiring corporation's stock that must be received by the stockholders of the acquired loss corporation before full utilization of the NOL carryover is allowed after a reorganization. This amendment applies only to taxable years beginning on or after January 1, 1984.

## D.

Finally, the Court does not find it necessary to reach the issue of whether the beneficial ownership of stock needs to be considered when applying the limitations of Section 382(b)(1)(B) and Section 383.

## III.

■ In view of the foregoing, the Court finds that requiring each NOL corporation or IC corporation involved in a single reorganization to separately meet the 20 percent test was not contemplated by Congress. Such a requirement imposes a more onerous burden than Congress intended in a valid reorganization of multiple corporations. It would also place form over substance, and, like the Treasury Regulation invalidated in *World Service*, would "ignor[e] the economic realities of the reorganization, and distor[t] the statutory scheme, and manifest intent of Congress in providing for net operating loss carryovers [and investment credit carryovers]." 471 F.2d at 254. Such distortion does not properly interpret the statute. Therefore, the Court finds that Treasury Regulation § 1.382(b)–1(a)(5) is invalid. The proper interpretation of Section 382(b) requires the merging NOL corporations to be considered together for purposes of applying the 20 percent limitation to the NOL carryovers.

An order has been entered contemporaneously in accordance with this Memorandum.

